## ALEXANDER L. A. MACKIE

*v.*

## LUCIUS T. DONOHUE et al.

[Submitted April 3d, 1920. Decided April 22d, 1920.]

1. Where taxes and other municipal liens were attempted to be adjusted by commissioners of adjustment, they should not group several lots in one parcel and adjust the liens in a single sum for each year against the group.

2. Where error is discovered in the report of the commissioners for adjustment of taxes and other municipal liens, the circuit court may refer the matter back for correction.

3. Where the first report of the commissioners of adjustment as to taxes and other municipal liens was defective, and the second report recited that it was readjusted by order of the court, it will thereafter be presumed when tax titles are questioned that such an order was made, though none can be discovered.

4. As the owner of land is charged with knowledge of the recital in a report of the commissioners of adjustment that it was readjusted by order of the court, he cannot, many years afterward. during which time the order may have been lost, attack a tax title based on the second report, on the ground that there was no order of court.

5. Where the original report of the commissioners of adjustment of taxes and other municipal liens was defective, and a second report was made, *certiorari* is the proper remedy to attack the second report on the ground that it was not authorized by order of the court.

6. That the remedy by *certiorari* to attack such a report has been lost by lapse of time does not give a court of equity jurisdiction.

7. Where the complainant secretly went about the premises for the purpose of asserting in the future that the defendant who held a tax title was not in possession, notwithstanding that the complainant knew of the defendant's title, a court of equity will resolve every doubt against the complainant.

8. In a suit to quiet title to lands which had been sold for taxes but to which the complainant, the successor in interest of the original owner, asserted that he had acquired adverse title, evidence *held* insufficient to establish such title.

9. Under section 119 of the act concerning conveyances a tax deed given by a municipality under the Martin act carries with it possession as an ordinary conveyance in view of the provision that the purchaser shall take good and sufficient title to the property sold in fee-simple, and that such a deed shall be presumptive evidence.

10. Where the lands were vacant, and there was no evidence of occupancy, a tax title under the Martin act is superior, as it is where the grantee was in possession before the successor to the original owner, who asserted an adverse title, instituted suit to quiet title.

On bill, &c.

*Mr. William Van Buskirk* and *Mr. Frank W. Hastings,* for the complainant.

*Messrs. Hamill & Cain* and *Mr. John F. Gough,* for the defendants John J. Cain and Duryea Manufacturing Company.

*Mr. Max Levy,* for the defendant Michael M. Keshin.

GRIFFIN, V. C.

The bill in this cause is filed to quiet title to lands in the city of Bayonne. The defendants' titles are derived from sales under the Martin act. *4 Comp. Stat. p. 5205.*

The complainant asserts: 1. That the titles of defendants under the Martin act are void. 2. That complainant and his predecessors in title have been in peaceable possession for upwards of forty years.

1. The facts upon which the complainant claims the defendants' titles are void are as follows:

The taxes and other municipal liens were attempted to be adjusted in report No. 5 of the commissioners of adjustment, dated September 20th, 1888; confirmed October 27th, 1888. By this report the commissioners adjusted the taxes against a great number of lots and parcels of land, but instead of adjusting the liens against each lot or parcel year by year, as theretofore assessed, separately, erroneously grouped several lots in one parcel and adjusted the liens in a single sum for each year against the group.

This method of assessment is erroneous. *Hayday* v. *Ocean City* (*1901*), *67 N. J. Law 155; Nichols* v. *Older* (*1910*), *78 N. J. Eq. 101.*

Within eight months after the confirmation of report No. 5, report No. 10 was filed and confirmed. This latter report covered lots in block 519 and block 535, which included the premises in question as well as lots in many other blocks, and adjusted the liens on the several lots in the manner provided by law, not only from 1877 to 1887, both inclusive, which were included in report No. 5, but also the liens for the year 1888.

In report No. 10, at the beginning of the adjustment against blocks 519 and 535, are the words "readjusted by order of the court."

It seems quite apparent that the error in the adjustment in report No. 5 was discovered, and thereupon the matter was referred back to the commissioners for readjustment; that the circuit court had power to make this order of reference is clear. In the case of *Erie Elevator Co.* v. *Jersey City, 84 N. J. Eq. 176,* in affirming the decree of the court of chancery (*83 N. J. Eq. 71*), Mr. Justice Bergen, speaking for the court of errors and appeals (at *p. 182*), said: "We think that the circuit court has the power to set aside such an order if it appears to have been improvidently made, or where the appellate court has determined that the adjustment has been made upon illegal principles, and to send the report back to the commissioners to make a legal adjustment; and that it has the power to confirm, in the manner

prescribed by law, the new adjustment such commissioners may report."

But complainant insists that there was no order for readjustment made by the court because none can be found of record. In this he cannot prevail. The words "readjusted by order of the court" above mentioned were in the report when presented to the court, and confirmed, and clearly demonstrate that such order had been made.

The complainant and his predecessors in title either had actual knowledge, or were charged with knowledge of this recital, and having failed to object to the confirmation of the report, it is now too late, after a lapse of more than thirty years, during which time the order may have been lost, to assert that this recital is untrue. *Erie Elevator Co.* v. *Jersey City, supra* (at *p. 182*).

I, therefore, find that the proceedings under the Martin act contained in report No. 10 were regular. If it were otherwise, the complainant had his remedy by *certiorari* and this court is without authority to entertain his bill, simply because the time within which to sue out his writ has passed. But I found my opinion principally upon the point that the proceedings were regular. From this it follows that the deeds made by the collector of revenue of the city of Bayonne vested in the grantees the fee-simple in accordance with their terms.

The second claim made by the complainant is that he and his predecessors in title were in peaceable possession of the lands for more than forty years down to the filing of the bill.

The premises in question and other contiguous property were purchased by the father of the complainant about 1858. Subsequently, it became vested in his mother, Catherine G. Mackie, who died seized on or about September 1st, 1868. She left her surviving her husband, Robert, and children, C. T. O. Mackie, E. E. W. Mackie, A. L. A. Mackie (the complainant), R. J. D. Mackie, S. F. Mackie, S. L. Mackie and G. B. Mackie, as her only heirs-at-law.

In 1876 a bill was filed in this court to partition said premises. A final decree was entered confirming the commissioners' report on January 16th, 1879.

By this decree the lots numbered and preceded with the letter G, as shown on the commissioners' map offered in evidence, were set off in severalty to Simon Frazier Mackie. Of these lots G 2, G 3, G 4 and G 5, in block 535, and G 3, in block 519, are in controversy. These lots are also shown on the city assessment map as follows: G 2 as lots 28 and 27, 27 being nearest to First street; G 3 as lot 3, G 4 as lot 6, and G 5 as lot 9, in block 535, and G 3, in block 519, is known as lot 31, block 519.

The parents of the complainant lived in the homestead, located on lots E 2, A 2 and C 2, situated on the northeast corner of First street and Newman avenue. Lot E 2 was set off to Schuyler L. Mackie; A 2 to Charles T. O. Mackie and C 2 to the complainant. There was also a stable located partially on G 2 and D 3 (lots 29 and 28), D 3 having been allotted to Robert J. D. Mackie and afterwards acquired by the defendant Cain in 1902. There were no other buildings on the land.

After the partition, and after the death of their father, which occurred in 1880, the complainant says that the family agreed to keep the property together as a homestead and the unmarried members occupied it. His best recollection is that the last of the family to reside there were his brothers Schuyler L. Mackie, Charles T. O. Mackie, and his sister, Mrs. Gilchrist, who moved away sixteen or eighteen years ago (1901 or 1903). He says that Simon Frazier Mackie, to whom the premises in question were allotted, resided in Salt Lake City, Utah, from 1881 to 1902, when and where he died; that after the family left, the homestead was rented, and the tenants, with permission of S. L. Mackie and himself, gardened lot 28 and occupied lot 27. He also says that tenants occupied the stable on lot 28. (The fact is that the stable is on lots 28 and 29.) He says nobody used the stable after the family moved away. He found Stringham had fenced off part of Avenue Q (Newman avenue), and his horses had the run of the stable. He did not lease to him, and never leased lots 3, 6, 9, 27 and 28, and he never paid taxes on them. After Stringham left someone else occupied the stable.

Edward Botsworth rented the homestead only from Schuyler Mackie, who was one of the owners, in 1906, and used the property in the block generally for farming. After he left his father-

in-law rented the homestead, and left it in 1914, after which Mrs. Hermanos rented the homestead.

Mr. Cain acquired title to lots 3, 6, 27 and 28 in 1903, and to lot 9 (sold to Duryea Manufacturing Company) in 1902, being the premises in question. He acquired other lots as follows: In 1901, Nos. 18 and 19; in 1902, Nos. 1, 5, 21 and 22; in 1903, Nos. 3, 12, 13, 14, 15, 23, 29, 30, 31, 32, 33; and in 1916, Nos. 2, 4, 10, 11, 34 and 35, all in block 535, in all, twenty-two lots, which he owned on and prior to 1909, and in 1916 owned twenty-eight out of a total of thirty-five lots in the block, all of which he purchased prior to the filing of the bill herein.

On the commissioners' map in partition each heir is given a letter which is prefixed to the lot, numbers of lots set off to him or her, as follows:

| | |
|---|---|
| Charles T. O. Mackie, | A |
| Euphemia E. W. Mackie, | B |
| Alexander L. A. Mackie, | C |
| Robert J. D. Mackie, | D |
| Schuyler L. Mackie, | E |
| George Barclay Mackie, | F |
| Simon F. Mackie, | G |

The diagram on the opposite page shows the location of the lots in block 535, the mansion house and stable, the lots conveyed to Cain and Duryea Manufacturing Company, and the lots set off to the various parties in partition, by letter and number.

As to the lots purchased prior to 1916, his vendors were persons other than the city, although the title to all the lots was derived through mesne conveyances from the city, who purchased under the Martin act. The conveyance of the lots in 1916 was made by the sister of the complainant, Mrs. Gilchrist, as sole devisee and executrix under the will of her brother Schuyler, by deed dated July 8th, 1916—five months before this bill was filed.

It appears clearly in the case that Mr. Cain has been in possession of these lands, since his purchase, as fully, openly and notoriously as could be expected in the case of lands so situated. He gave permission to one Stringham, about 1907, to keep his horses in the stable and on his lots in the block. Stringham

*92 N. J. Eq.*                    *Mackie v. Donohue.*

patched the old fence around three sides of the block. The first avenue side he did not touch, because the homestead property and fences on that side were sufficient for the purpose. He does not recall if Stringham paid him for such use. He also rented the stable to Mrs. Hermanos about 1914, at $3 a month. She has continued in the possession as his tenant ever since. She lives in the homestead, which she rented from the Mackies.

About thirteen or fourteen years ago Cain leased part of lot 27 and lots 28, 18, 19, 21 and 22 to one Bernstein for $60 for the season, to be used as an amusement park. Bernstein put up fences between lots 17 and 18, which extended from twenty-five to forty feet into lot 28, and from thence across lots 28 and 27 to the rear of lot 23.

Mr. Mackie, the complainant, upon being recalled, said that the amusement park opened, he thinks, in April, 1909; that he made measurements at the time, which he thinks are at his home, from which he made a map of the fenced area, and that it did not touch lots 27 and 28, but was wholly to the east of the rear line of these lots, on lots 18 and 19.

Turning to the conduct of the complainant, it appears that for upwards of thirty-five years it was his habit, every two or three months, to search the records of the county and communicate the facts disclosed to his brother Simon. Thus he acquired actual knowledge of the various deeds and conveyances about the time of their record. He knew that Mr. Cain had deeds for these premises, was exercising acts of ownership over the same, and was paying the taxes year by year; yet he never made the slightest suggestion to Mr. Cain that his brother Simon, in his lifetime, or his daughter after his decease, had any claim, estate or interest in these premises; nor did Simon, in his lifetime. nor his daughter after his decease, assert such claim. But, with full knowledge of the facts, complainant secretly went about the premises, apparently making measurements for the purpose, at some future day, of being prepared to combat the claim which the defendant Cain might assert that he was in possession. In 1912 he took a deed from Margaret, the daughter and only heir-at-law of Simon, and about four years later filed his bill. Apart from the fact that the evidence is quite clear that Mr. Cain was

in possession, a court of conscience, in dealing with the conduct of the complainant, should resolve against him on every doubtful question.

I find, as a matter of fact, that the complainant was not in possession, and that Mr. Cain was in possession from the date of the deeds to him, being about the year 1903; and I find, as a matter of law, that the deeds from the collector of revenue of the city of Bayonne to its grantees operated, under the Martin act, to place the possession of the premises in question in the grantees, under the one hundred and nineteenth section of the act respecting conveyances. *1 Gen. Stat. p. 877*, and cases·in note; *2 Comp. Stat. p. 1536* § 7. This counsel for complainant admits to be the law, in conveyances generally, but says that a tax deed stands on a different footing, and implies no livery of seizin; that the purchaser must take possession or lose his right by limitation, citing *Beatty* v. *Lewis, 68 Atl. Rep. 95.* In that case a tax sale was made by the city of Hoboken for a term of years; under the charter, the owner had a right to redeem within two years after the sale, after which date, if not redeemed, the purchaser had the right to possession. Vice-Chancellor Howell held that this tax certificate did not vest immediate possession, but only the right to possession at the end of two years; that something had·to be done by the purchaser at the end of two years to obtain possession. This decision has no bearing on the present case. Under the Martin act, section 6, it is provided that the purchaser, after the sale and before receiving his deed, shall be entitled to possession of the lands immediately upon giving notice to the owner thereof, in case the same are unoccupied, or, if they are occupied, then within thirty days thereafter—apparently following the spirit of the old tax acts such as are contained in the charter of the city of Hoboken. No such language is contained in the Martin act as to the deed. In section 5 it says:

"The purchaser, his heirs, legal representatives or assigns, by his deed shall take a good and sufficient title to the property sold, in fee-simple, absolute, free from all encumbrances, etc., of which the deed shall be presumptive evidence in all places."

This places a deed given under the Martin act on the same footing as a deed given by an individual owner of property, thereby putting defendant in possession as fully as if there was livery of seizin.

At page 177 of the testimony Mr. Hastings made an objection, which, apparently, was abandoned in his brief (and I think properly so), that the lands in one deed are described as "fronting on Fourth street, in the city of Bayonne," whereas, in fact, they front on Newman avenue. This part of the description may be rejected as false, the remainder being sufficient to identify the property conveyed.

The decree will be for the defendant Cain in the usual form.

As to Keshin: Lot 31, block 519; lot vacant. There were no signs of occupancy by anyone. Certainly, after Keshin became seized of the premises under his deed, no acts of ownership, open, hostile and notorious, are exhibited in this case by the complainant, or those under whom he claims, which would constitute an adverse possession, or any possession whatsoever. Keshin visited the premises occasionally and paid the taxes thereon.

The decree, therefore, will be in favor of Keshin.

What has been said to the above defendants applies with equal force to the Duryea Manufacturing Company (lot 9, block 535), with the additional remark that it is perfectly plain that the Duryea Manufacturing Company commenced the erection of its building on the land prior to the commencement of this suit, and, therefore, under no circumstances, could the complainant claim to have been in possession of this lot at the time of the filing of the bill.

The decree will be in favor of the Duryea Manufacturing Company.